(Slip Opinion)

# Validity of Congressional Subpoena That Would Prevent the Secretary of State from Fulfilling the President's Directive to Represent the United States at a Major Diplomatic Event

A congressional committee's subpoena for the Secretary of State's appearance on a date that would prevent the Secretary from fulfilling the President's directive to represent the United States at a major diplomatic event would unconstitutionally interfere with the President's authority to conduct the Nation's foreign affairs. The subpoena requiring the Secretary's appearance on that date is invalid and lacks legal effect, and the Secretary may not be punished by civil or criminal means for failing to appear on that date.

September 23, 2024

MEMORANDUM OPINION FOR THE
PRINCIPAL DEPUTY LEGAL ADVISER
DEPARTMENT OF STATE

On September 18, 2024, the House Committee on Foreign Affairs ("Committee") subpoenaed the Secretary of State ("Secretary") to testify at a hearing in the Rayburn House Office Building in Washington, D.C., at 10 a.m. Eastern Time on September 24. You have asked whether the Committee may compel the Secretary to appear at that time in light of the Secretary's longstanding precommitment to be in New York on September 24 at the United Nations ("U.N.") General Assembly and U.N. Security Council, where, at the President's direction, he will be engaging with foreign heads of state and counterparts on important diplomatic and foreign policy matters.

For the following reasons, we conclude that the Committee's subpoena for the Secretary's appearance on September 24, which would prevent the President's chief diplomat from fulfilling the President's directive to represent the United States at a major diplomatic event, would unconstitutionally interfere with the President's authority to conduct the Nation's foreign affairs. Accordingly, we conclude that the Committee's subpoena requiring the Secretary's appearance on that date is invalid and lacks legal effect, and that the Secretary may not be punished by civil or criminal means for failing to appear on that date. We emphasize, however, that an agency head is not constitutionally immune from appearing before a congressional committee in response to a testimonial subpoena and that

1

nothing in this opinion should be read to obviate the State Department's constitutional obligation to attempt to accommodate the Committee's interest in the Secretary's testimony.

## I.

### A.

In 2023, following the United States's withdrawal from Afghanistan in 2021, the Committee began an oversight investigation and sent the State Department several requests for documents, briefings, and interviews. *See* Letter for Michael T. McCaul, Chairman, House Foreign Affairs Committee, from Antony Blinken, Secretary of State at 1 (Sept. 22, 2024) ("September 22 Letter"). Since then, the Committee and the State Department have worked through multiple rounds of oversight requests related to the Afghanistan withdrawal. *Id.* To date, the Secretary and the State Department have made significant accommodations to the Committee in connection with its investigation. *Id.* at 1–2. The Secretary has testified publicly before Congress on the topic of the Afghanistan withdrawal on numerous occasions, including multiple times before the Committee; the State Department has made available or facilitated the appearance of 15 current and former senior officials for transcribed interviews to Committee staff and Members; and the Department has provided more than 20,000 pages of documents to the Committee, including allowing the Committee to review a highly sensitive State Department cable and internal memoranda related to the Department's After-Action Review. *Id.* at 2.

On August 12, the Committee formally requested that the Secretary testify before it again at a hearing on September 10 to discuss the Committee's then-forthcoming report on the withdrawal from Afghanistan. *See* Letter for Antony Blinken, Secretary of State, from Michael T. McCaul, Chairman, House Foreign Affairs Committee (Aug. 12, 2024). The Secretary and Committee Chairman Michael McCaul spoke about the Committee's request on August 19 and September 3, and the Secretary explained that he was planning to travel, at the President's direction, during the weeks of September 9, 16, and 23 in order to further diplomatic efforts to address the conflict in Ukraine; to promote a ceasefire arrangement to stop fighting and secure the release of hostages, including U.S. citizens, held in Gaza; and to represent the United States at the U.N. General

Assembly. *See* Memorandum for Christopher C. Fonzone, Assistant Attorney General, Office of Legal Counsel, from Joshua L. Dorosin, Deputy Legal Adviser, Department of State, *Re: Subpoena for the Secretary of State's Appearance at a Hearing on September 24, 2024*, at 1 (Sept. 20, 2024) ("State Department Memorandum"). The Secretary offered a Deputy Secretary to appear in his stead, and also offered to testify at a later date, but the Chairman rejected the offer and insisted on the Secretary's testimony in September. *Id.*

Shortly after the September 3 phone call between the Secretary and the Chairman, the Committee issued a subpoena for the Secretary's testimony on September 19. *See* Letter for Antony Blinken, Secretary of State, from Michael T. McCaul, Chairman, House Foreign Affairs Committee (Sept. 3, 2024) (attachment). On September 18, the Committee reissued the subpoena in light of the fact that the Secretary was scheduled to be in Egypt on September 19, following meetings with President El-Sisi and Foreign Minister Abdelatty, including to advance the President's efforts to secure a ceasefire in Gaza. *See* Letter for Antony Blinken, Secretary of State, from Michael T. McCaul, Chairman, House Foreign Affairs Committee (Sept. 18, 2024) (attachment). The reissued subpoena called for the Secretary to testify on a new date, September 24, *id.*—a date the Committee selected without consulting with the State Department, *see* State Department Memorandum at 1–2. On September 20, the Committee noticed a hearing to take the Secretary's testimony on September 24, as well as a markup vote to find the Secretary in contempt of Congress for failing to comply with the Committee's subpoena. *See* Resolution Recommending That the House of Representatives Find Secretary of State Antony J. Blinken in Contempt of Congress for Refusal to Comply with a Subpoena Duly Issued by the Committee on Foreign Affairs, H.R. Res., 118th Cong. (2024) (draft) ("Committee Contempt Resolution").

## B.

As the Secretary indicated to the Chairman when they spoke on September 3, the Committee's new subpoena date of September 24 falls during high-level week of the U.N. General Assembly. *See* September 22 Letter at 3. Planned and announced publicly months in advance by the U.N., high-level week is the annual convening when heads of state and foreign ministers travel to New York to discuss top diplomatic and for-

eign policy priorities. *Id.* The State Department has informed us that, as the host nation for the U.N. Headquarters in New York, the United States has a special responsibility to ensure extensive participation at the highest levels of our government in high-level week, and that, accordingly, the Secretary typically attends meetings throughout the week. *See* State Department Memorandum at 4.

Consistent with this longstanding practice, the State Department has further informed us that on September 24 the Secretary will, at the President's direction, be attending a series of meetings with foreign leaders to address the President's highest foreign policy priorities. Notably, this is the only opportunity for the Secretary to carry out these diplomatic engagements this year, as this assembly of world leaders will not occur again until September 2025. *See id.* at 6. According to the State Department, the Secretary is almost continuously booked for the entire day in New York on September 24, with his schedule including the following:

- preparing and joining the President for his morning address to the nearly 200 member states of the U.N. General Assembly;
- joining the President for a bilateral engagement with the U.N. Secretary General to address pressing diplomatic issues, including ending the conflict in Gaza and bringing home Americans held hostage in that conflict, ending humanitarian suffering in Sudan, and supporting the multilateral security mission in Haiti;
- hosting the Global Coalition on Synthetic Drugs, a leader-level meeting to increase international efforts to curb the production and trafficking of fentanyl into the United States;
- representing the United States in the U.N. Security Council debate on the conflict in Ukraine; and
- meeting with foreign ministers in the Partnership for Global Infrastructure to secure commitments for the Lobito Corridor, a signature initiative of the President in Africa.

*Id.* at 5–6. In addition, the Secretary plans to participate in other essential high-level bilateral and multilateral engagements throughout the day. *Id.*

The State Department has informed the Committee that its revised subpoena date of September 24 conflicts with these important diplomatic activities that the Secretary is undertaking at the direction of the Presi-

dent. *See* September 22 Letter at 3–4. On September 22, the Secretary offered to testify before the Committee once the Secretary returns from his travel. *Id.* at 4.

## II.

## A.

It is well established that, when exercising its investigatory powers, Congress may not "supplant the Executive in what exclusively belongs to the Executive" and "must exercise its powers subject to the limitations placed by the Constitution on governmental action." *Barenblatt v. United States*, 360 U.S. 109, 111–12 (1959). It follows that a congressional subpoena cannot be enforced to the extent it substantially "impede[s] [the President's] constitutional duties." *Trump v. Vance*, 591 U.S. 786, 810 (2020). Specifically, if a subpoena "would significantly interfere with [the President's] efforts to carry out those duties," the subpoena should be "quash[ed] or modif[ied] . . . if necessary to ensure that such interference with the President's duties would not occur." *Id.* (cleaned up).

Consistent with these principles, this Office on numerous occasions has determined congressional subpoenas to be invalid when they unconstitutionally interfered with the President's ability to perform his constitutional responsibilities.[1] Of particular relevance here, both the Supreme Court

---

[1] *See, e.g.*, *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __ (May 23, 2019) (concluding that congressional attempts to prohibit agency counsel from accompanying employees called to testify about matters that potentially involve information protected by executive privilege unconstitutionally impair the President's constitutional authority to control the disclosure of privileged information); *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ (May 20, 2019) (concluding that a congressional authority to compel the President's immediate advisers to appear and testify at the times and places of Congress's choosing would directly interfere with the President's ability to discharge his responsibilities); *Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5 (2014) (similar); *see also Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 3 (2007) (Clement, Acting Att'y Gen.) (stating that "there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone"); *Assertion of Executive Privilege With Respect to Clemency*

and our Office have long recognized that the President may assert executive privilege over documents and decline to comply with a subpoena demanding their production when disclosure would impair the United States's diplomatic or foreign relations. *See United States v. Nixon*, 418 U.S. 683, 706 (1974); *Assertion of Executive Privilege for Documents Concerning Conduct of Foreign Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 6 (1996) (Reno, Att'y Gen.). Thus, Congress's oversight authority cannot override the President's ability to protect the conduct of diplomacy and foreign affairs with respect to the production of documents, at a minimum unless Congress demonstrates a demonstrably critical need. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). It follows that Congress cannot use its oversight power to unconstitutionally infringe on the President's conduct of diplomacy and foreign affairs directly.

## B.

But that is precisely the effect of the Committee issuing a subpoena that demands the Secretary appear at a hearing on September 24. Specifically, the date of the testimony called for in the subpoena conflicts with important diplomatic activities the Secretary is undertaking at the direction of the President, and there is no possibility of rescheduling those activities. Giving effect to the subpoena would thus unconstitutionally interfere with the President's authority to conduct the Nation's foreign affairs by preventing the President's chief diplomat from fulfilling the President's directive to represent the United States at a major diplomatic event.

## 1.

Although the Constitution divides the Nation's foreign affairs powers between the Branches, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015), when it comes to "dealings with foreign nations," the President is "the constitutional representative of the United States," *United States v. Louisiana*, 363 U.S. 1, 35 (1960). And since the Nation's earliest

---

*Decision*, 23 Op. O.L.C. 1, 3 (1999) (Reno, Att'y Gen.) (explaining that Congress's oversight authority did not extend to the President's exclusive authority to make clemency decisions).

history, Presidents have understood this responsibility to carry with it the exclusive authority to send their "preferred agents to engage in a category of important diplomatic relations, and thereby determine the form and manner in which the Executive engages in diplomacy." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 227–31 (2009) ("*Delegations to U.N. Agencies*").

Thus, our Office has repeatedly explained that "the President possesses the exclusive authority to determine the time, scope, and objectives of international negotiations or discussions, including the authority to determine the individuals who will represent the United States in those diplomatic exchanges." *Id.* at 231 & n.9 (cleaned up). Our Office has further made clear that the President's exclusive authority to determine the manner in which the Executive engages in diplomacy extends not only to missions abroad, but also to diplomatic engagements in international fora located within the United States, such as the U.N. *Id.* at 235; *see also Application of the Anti-Terrorism Act of 1987 to Diplomatic Visit of Palestinian Delegation*, 46 Op. O.L.C. __, at *6 (Oct. 28, 2022). And statutory law by and large reflects these understandings, including with respect to delegations to the U.N. *See, e.g.*, 22 U.S.C. § 287a ("[Presidentially appointed representatives], when representing the United States in the respective organs and agencies of the United Nations, shall, at all times, act in accordance with the instructions of the President . . . ."); *id.* § 2656 ("The Secretary of State shall perform such duties . . . respecting foreign affairs as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.").

### 2.

Enforcement of the Committee's subpoena for the Secretary's testimony on September 24 would run afoul of these principles. As laid out above, on that date, the Secretary, at the President's direction, will, among other things, be preparing and joining the President for his address to the U.N. General Assembly; meeting, alongside the President, with the U.N. Secretary General; hosting the Global Coalition on Synthetic Drugs; and representing the United States in the U.N. Security Council debate on the

conflict in Ukraine. This assembly of foreign leaders and counterparts is the only opportunity of its kind for the Secretary to participate in these important diplomatic engagements on significant and pressing matters. *See* State Department Memorandum at 6. The Secretary's schedule for September 24 was also largely set before September 18, the date that the Committee issued its subpoena and scheduled its contempt vote, and six days would not provide enough time to reschedule the Secretary's wide array of planned high-level diplomatic engagements. Thus, enforcing the Committee's subpoena would plainly deprive the President of his exclusive constitutional prerogative to send his "preferred agents to engage in a category of important diplomatic relations." *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 226–27 (finding unconstitutional an appropriations provision that "denie[d] the President the use of his preferred agents—representatives of the State Department—to participate in delegations to specified U.N. entities chaired or presided over by certain countries").

The consequences of this deprivation, moreover, would be significant: The Secretary is the President's primary, most essential, and most visible representative in matters of diplomacy and foreign relations, and his absence could seriously detract from the United States's diplomatic efforts at the U.N. General Assembly and U.N. Security Council. *See* State Department Memorandum at 6. Given the Secretary's status as the Nation's top diplomatic officer and his extensive prior participation in these matters and with these foreign counterparts, there is no adequate substitute to take his place or who is equally well equipped to handle these delicate negotiations. *Id.* at 6–7. If a congressional committee could effectively recall the President's top diplomat in this manner, it would allow any individual committee or chair to impair the President's exclusive authority to "determine the time, scope, and objectives of international negotiations or discussions" and frustrate important diplomatic efforts under the guise of conducting oversight. *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 231 (internal quotation marks omitted).

We further note that, even if the President's constitutional authority to send a designated representative to engage in significant diplomatic efforts were not preclusive of congressional action, the Committee has not articulated a sufficient need that would require the Secretary's appearance on September 24, as opposed to a different date. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977) (holding that, when executive and

legislative authorities conflict, Congress may not "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions" absent "an overriding need to promote objectives within the constitutional authority of Congress"). While we do not question that the Committee has a legitimate and substantial interest in conducting oversight of the United States's withdrawal from Afghanistan, it has been looking into the withdrawal for some time and the timing of high-level week has been public for months. Yet the only explanation the Committee has given as to why the Secretary's appearance on September 24 is critical to accomplishing its constitutionally assigned functions is that the Secretary's "refusal to appear before the Committee in September would hinder its opportunity to move forward with legislative action in a timely manner." Committee Contempt Resolution at 25. But the Secretary has already made clear to the Committee that the State Department stands ready to work with the Committee on any legislation it is considering as a result of its oversight into the Afghanistan withdrawal, *see* September 22 Letter at 5, and the Committee's generalized interest in passing legislation expeditiously is, in any event, not a need that would allow the Committee to "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at 443.

Indeed, given the accommodations the State Department has made to the Committee to date, including its recent offer to have the Secretary appear after his return from New York, it is difficult to see how the Committee could have a sufficient need for the Secretary's appearance on this exact date in light of his preexisting diplomatic commitments. The accommodation process requires each branch to "take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). This means that the accommodation process will not always result in a congressional committee obtaining testimony at the exact date and time of its choosing; nor will the testimony always fit perfectly into the schedule of a subpoenaed Executive Branch official.

In the context of civil and criminal litigation, by way of analogy, pressing business may excuse a subpoena recipient's failure to testify on a specific day, even when they are not exempt from the general obligation to comply. *See, e.g.*, Fed. R. Civ. P. 45(d)(3)(A); Fed. R. Crim. P.

17(c)(2); *see also* Memorandum from the Office of Legal Counsel, *Re: Amenability of Special Assistant to the President to Congressional Subpoena* at 4 (Jan. 31, 1964) ("Cabinet members are not exempt from [compulsory] processes, although pressing government business may excuse a failure to attend court on a specific day."). Here, although the Secretary is not immune from appearing before congressional committees—and the State Department maintains a constitutional obligation to attempt to accommodate the Committee's interest in the Secretary's testimony—the need to protect the United States's diplomatic efforts is a significant interest that the Committee has a constitutional obligation to seek to accommodate. But instead of working further with the State Department to identify an alternative to the Secretary testifying on September 24, the Committee has scheduled a markup vote to find the Secretary in contempt of Congress for failing to comply with the Committee's subpoena.

For these reasons, we conclude that the Committee's subpoena for the Secretary's testimony on September 24 unconstitutionally interferes with the President's exclusive authority to determine the form and manner of diplomatic negotiations, and therefore is invalid and without legal effect.

## III.

Because the Committee may not constitutionally compel the Secretary to appear on September 24, the Secretary may not be punished by civil or criminal means for failing to appear on that date.

In 1984, our Office explained at length why the contempt of Congress statute, 2 U.S.C. §§ 192 and 194, "was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984) ("*Prosecution for Contempt*"). "[T]he Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution." *Id.* at 140. If executive officials were subject to prosecution when they carried out the President's claim of executive privilege, it would "deter the President from asserting [the] privilege and . . . make it difficult for him to enlist the aid of his subordinates in the process,"

which would "significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Id.* at 134, 137; *see also Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995) ("[A]pplication of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress.").

In the context of senior presidential advisers' immunity from compelled congressional testimony, we have explained that similar "principles . . . shield a current or former senior adviser to the President from prosecution for lawfully invoking his or her immunity." *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress*, 32 Op. O.L.C. 65, 68 (2008). "Subjecting a senior presidential adviser to prosecution for asserting a good-faith claim of testimonial immunity would equally impose upon the President the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility he found necessary to the performance of his constitutional duty." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *20 (May 20, 2019) (internal quotation marks omitted); *see also Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14 (May 23, 2019) (concluding that agency officials "who follow an agency instruction not to appear without the presence of an agency representative are acting lawfully to protect the constitutional interests of the Executive Branch").

For the same reasons, the contempt of Congress statute does not and could not constitutionally apply to the Secretary's noncompliance with the Committee's subpoena here, as such compliance would prevent the Secretary from engaging in presidentially directed diplomatic initiatives and would unconstitutionally interfere with the President's authority to conduct the Nation's foreign affairs. Application of the contempt statute in these circumstances would place the Secretary, the President's top diplomatic agent, in the impossible position of choosing between legal jeopardy and carrying out the President's constitutional responsibilities, which would "significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties." *Prosecution for Contempt*, 8 Op. O.L.C. at 134. In short, "[t]o seek criminal punishment for those

who have acted to aid the President's performance of his duty would be . . . inconsistent with the Constitution." *Id.* at 142.[2]

## IV.

We conclude that the subpoena seeking to compel the Secretary to appear on September 24 is invalid and lacks legal effect, as it would prevent the President's chief diplomat from fulfilling the President's directive to represent the United States at a major diplomatic event. The criminal contempt of Congress statute thus does not and cannot constitutionally be applied to the Secretary's failure to appear on that date, nor can his failure to appear be the subject of civil liability or inherent contempt. We emphasize that this conclusion applies to the date identified in the Committee's September 18 subpoena, during which time the Secretary will be engaged in significant diplomatic assignments, at the President's direction, at the U.N. General Assembly and U.N. Security Council. We have not considered and are not opining on the enforceability of a testimonial subpoena issued to the Secretary under other circumstances.

We further emphasize that, as noted above, an agency head is not constitutionally immune from appearing before a congressional committee in response to a testimonial subpoena. On the contrary, "the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes[,] . . .

---

[2] Likewise, "[t]he constitutional separation of powers bars Congress from exercising its inherent contempt power" under these circumstances. *Testimonial Immunity Before Congress of the Former Counsel to the President* at *20. "[T]he same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." *Prosecution for Contempt*, 8 Op. O.L.C. at 140 n.42. "Congress may not impede the President's ability to carry out his constitutionally assigned functions by arresting, bringing to trial, and punishing an executive official who asserted a Presidential claim of executive privilege." *Testimonial Immunity Before Congress of the Former Counsel to the President* at *21 (cleaned up). "An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and would immeasurably burden the President's ability . . . to carry out his constitutional functions." *Id.* at *20–21 (internal quotation marks omitted). Accordingly, any attempt by the House to use its inherent contempt power to punish the Secretary for not appearing before the Committee on September 24 would be unconstitutional.

can and do testify before Congress." *Testimonial Immunity Before Congress of the Former Counsel to the President* at *4. To that end, we note that "the constitutionally mandated accommodation process runs both ways." *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees* at *19. Although the Secretary's appearance before the Committee on September 24 would unconstitutionally interfere with the President's responsibilities as constitutional representative of the United States in dealings with foreign nations, that does not obviate the State Department's obligation to attempt to accommodate the Committee's interest in the Secretary's testimony. We therefore understand that the State Department will continue to work with the Committee to identify an appropriate date for the Secretary's appearance or other means for providing the Committee the information it seeks in support of its oversight needs.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*