| People v Trump |
| :---: |
| 2025 NY Slip Op 30014(U) |
| January 3, 2025 |
| Supreme Court, New York County |
| Docket Number: Indictment No. 71543-23 |
| Judge: Juan M. Merchan |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>- against –<br><br>DONALD J. TRUMP,<br><br>                            Defendant. | **DECISION and ORDER**<br><br>Defendant's Motion to Dismiss the Indictment and Vacate the Jury's Verdict Pursuant to CPL §§ 210.20(1)(h) and 210.40(1)<br><br>Indictment No. 71543-23 |

JUAN M. MERCHAN, A.J.S.C.:

### PART I: BACKGROUND AND PROCEDURAL HISTORY

On May 30, 2024, a New York County jury returned a verdict finding Defendant guilty after trial, on 34 counts of Falsifying Business Records in the First Degree. That same day, this Court set a deadline of June 13, 2024, for the filing of post-trial motions. The deadline passed without the filing of any motions.

The Court set the matter down for the imposition of sentence to July 11, 2024. However, that date was adjourned to September 18, 2024, as a direct result of the United States Supreme Court's decision in the matter of *Trump v. United States*, 603 US 593 [2024]. On August 14, 2024, Defendant requested an adjournment of sentencing until after the 2024 Presidential election. The People did not oppose Defendant's request. As a result, on September 6, 2024, this Court adjourned sentencing, if necessary, to November 26, 2024.

On November 10, 2024, following the 2024 Presidential election, Defendant requested a "stay [of] the existing scheduled dates […], and eventual dismissal of the case in the interests of justice, under the US Supreme Court's decision in *Trump v. United States* and the Presidential Transition Act of 1963." On November 22, 2024, this Court granted Defendant leave to file a motion pursuant to Criminal Procedure Law § 210.40(1) (Motion to Dismiss Indictment in Furtherance of Justice – otherwise known as a "Clayton Motion") and set a motion schedule. Defendant filed the

instant motion on December 2, 2024. The People filed their Response on December 9, 2024, and Defendant filed his Reply on December 13, 2024.[1]

The following constitutes the Decision and Order of this Court.

## PART II: ARGUMENTS OF THE PARTIES

Defendant argues that "[t]he Presidential immunity doctrine, the Presidential Transition Act, and the Supremacy Clause all require" dismissal "immediately." Defendant's Motion at pg. 1. In support, Defendant points not only to his status as President-elect, but also to alleged "unlawful" conduct by the prosecution, rulings of this Court allegedly in violation of Defendant's rights, and claimed evidentiary infirmities at trial, which either present a legal impediment to conviction or together, require dismissal in the interests of justice. The allegations of "unlawful" conduct against the New York County District Attorney ("DANY") include claims that DANY engaged in "politically motivated targeting" of Defendant; unlawfully "leaked" information about the investigation; tainted the jury pool by making improper public statements; engaged in repeated misrepresentations to this and other courts before, during, and after trial; and suborned perjury from prosecution witnesses, Michael Cohen and Stormy Daniels. Defendant also accuses this Court of impermissibly presiding over this matter despite the existence of an alleged conflict of interest, and of imposing an "unlawful gag order," a reference to this Court's Order Governing Extrajudicial Statements.[2]

---

[1] On December 16, 2024, the Court issued its Decision and Order denying Defendant's separate Motion to Vacate and Dismiss pursuant to CPL § 330.30(1).

[2] This Court recognizes that the lawyering by both the prosecution and the Defense has been exceptional and spirited throughout the entirety of this case. It is clear that the People have prosecuted this matter to the best of their abilities and the Defense has represented their client zealously. There have however, been instances when in written submissions, counsel has come dangerously close to crossing the line of zealous representation and the professional advocacy one would expect from members of the bar and officers of the court and this Court has at times, made counsel aware of its observations and concerns. Now however, counsel has resorted to language, indeed rhetoric, that has no place in legal pleadings. For example, countless times in their Motion to Dismiss, counsel accuses the prosecution and this Court of engaging in "unlawful" and "unconstitutional" conduct. *See* Defendant's Motion at pgs. 1, 6-9, 11, 43, 51. These same terms are also peppered throughout Defendant's Reply. Those words, by definition, mean "criminally punishable." (Black's Law Dictionary 748-749 [Third Pocket Edition]). Viewed in full context and mindful of the parties to this action, such arguments, in the broader picture, have the potential to create a chilling effect on the Third Branch of government. Indeed, Chief Justice Roberts in his 2024 Year End Report on the Federal Judiciary, felt compelled "to address four areas of illegitimate activity that, in my view, do threaten the independence of judges on which the rule of law depends: (1) violence, (2) intimidation, (3) disinformation, and (4) threats to defy lawfully entered judgments." J.G.

The People oppose Defendant's motion arguing that "President-elect immunity does not exist," and that the "vast majority of defendant's claims involve objections that this Court and others have repeatedly rejected." People's Response at pg. 1. The People submit alternative remedies, short of a dismissal, which they argue still respect the doctrine of Presidential immunity from criminal process while at the same time respecting the verdict rendered by the New York County jury. The alternative proposals include adjourning sentencing until after Defendant completes his term of office or the application of the "Alabama Rule" which would effectively permanently abate proceedings without dismissal or the imposition of sentence.

## PART III: THE JURY VERDICT

As indicated above, the Defendant has been found guilty on 34 felony counts. The significance of the fact that the verdict was handed down by a unanimous jury of 12 of Defendant's peers, after trial, cannot possibly be overstated. Indeed, the sanctity of a jury verdict and the deference that must be accorded to it, is a bedrock principle in our Nation's jurisprudence. "The right to have a jury make the ultimate determination of guilty has an impressive pedigree. Blackstone described 'trial by jury' as requiring that '*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors." *United States v. Gaudin*, 515 US 506 [1995], citing to 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added). Even an examination of *how* a jury reached its verdict must be approached with caution as only extraordinary

---

Roberts, Jr., 2024 Year End Report on the Federal Judiciary at pg. 5. "Public officials, too, regrettably have engaged in recent attempts to intimidate judges – for example, suggesting political bias in the judge's adverse rulings without a credible basis for such allegations. […]. Attempts to intimidate judges for their rulings in cases are inappropriate and should be vigorously opposed." *Id.* at pg. 7. "Judicial independence is worth preserving. As my late colleague Justice Ruth Bader Ginsburg wrote, an independent judiciary is 'essential to the rule of law in any land' yet it 'is vulnerable to assault; it can be shattered if the society law exists to serve does not take care to assure it's preservation.'" *Id.* at pg. 8 citing R.B. Ginsberg, Remarks on Judicial Independence, Conference of American Judges Association, 2006. "Of course, the courts are no more infallible than any other branch. In hindsight, some judicial decisions [are] wrong, sometimes egregiously wrong." *Id.* at pg. 5.

Wrong – not "unlawful" or deliberately violative of a litigant's constitutional rights - and our Rule of Law provides a system of appellate review for higher courts to consider a litigant's claim of error below. This Court is in complete agreement with Chief Justice Roberts' views on this subject. Dangerous rhetoric is not a welcome form of argument and will have no impact on how the Court renders this or any other Decision.

circumstances warrant second guessing the deliberative process. *See People v. Testa*, 61 NY2d 1008 [1984].

In fact, it is standard practice in criminal courts in this state to instruct jurors at the start of every trial, and to remind them before commencing deliberations, that "[y]ou and you alone are the judges of the facts, and you and you alone are responsible for deciding whether the defendant is guilty or not guilty." CJI2d[NY] Role of the Court and Jury. The practical and policy concerns implicated by these instructions are legion. *People v. Oldham*, 58 Misc 3d 807 [Sup Ct, New York County 2018]. As such, arriving at a unanimous verdict after applying their "collective intelligence and experience" reviewing and analyzing evidence is "regarded as a hallmark of our judicial system." *People v. Brown*, 48 NY2d 388 [1979]. Thus, it is understandably rare, for a trial court to overturn a unanimous jury verdict.

## PART IV: PRESIDENTIAL IMMUNITY FROM CRIMINAL PROSECUTION

Defendant makes clear that the "driving 'compelling factor'" requiring vacatur of the jury's verdict and dismissal of the indictment is "Presidential immunity and the Supremacy Clause." Defendant's Motion at pg. 54. Thus, the primary issue before this Court is: whether a President-elect must be afforded the same immunity protections from a state prosecution as a sitting President? This issue, as far as this Court can discern, is without precedent. Although the parties agree on very little, they both appear to recognize the paucity of available precedent to assist this Court in evaluating Presidential immunity in the instant context. Though the parties arrive at starkly different conclusions, they both rely on the same small universe of legal authority to support their respective arguments. This guidance can be found primarily in *Trump v. United States*, 603 US 593 [2024]; *United States v. Nixon*, 418 US 683 [1974]; *Nixon v. Fitzgerald*, 457 US 731 [1982]; *Clinton v. Jones*, 520 US 681 [1997]; *Trump v. Vance*, 591 US 786 [2020]; The Presidential Transition Act of 1963; 1973 Office of Legal Counsel ("OLC") Memorandum *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office;* and 2000 OLC Memorandum *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291 [Oct. 16, 2000]. The clear concerns confronted by the aforementioned sources, which are detailed in the 2000 OLC Memorandum, and referenced by the parties, are:

1. The actual imposition of a criminal sentence of incarceration;
2. The public stigma occasioned by the initiation of criminal proceedings; and
3. The mental and physical demands of assisting with the preparation of a defense for the various stages of a criminal proceeding.

As noted by the Special Counsel's Office in their recent memorandum of dismissal, the 1973 and 2000 OLC memos addressed only federal cases involving Presidents. *See Government's Motion to Dismiss, United States v. Trump*, US Dist Ct, DDC, Chutkan, J. No. 23-cr-257, ECF No. 281 ("As with the 1973 and 2000 OLC Opinions, OLC's analysis addressed only the federal cases pending against the defendant."). A fair reading of the scant legal precedent in this area of the law supports that the decisions rendered by the Supreme Court over the prior decades were also focused on addressing federal cases brought against Presidents, with *Vance* being the one exception.[3] However, it is logical to infer that the three concerns expressed in the 2000 OLC memorandum can overlap with criminal prosecutions that occur in state court. The first consideration set forth in the 2000 OLC memo, incarceration as a criminal sentence, carries the same restrictions as that of a federal sentence, i.e. deprivation of liberty. Second, the "public stigma" of a criminal proceeding will likely occur in both, federal and state courts. Lastly, the "mental and physical burdens" that would befall a defendant assisting in his defense against criminal charges would be largely the same in federal and state proceedings. They both require such exercises as witness preparation, analysis of discovery material and evidence, and overall trial strategy. Furthermore, the balancing of competing public interests, i.e. that of protecting the powers and functions of the Executive Branch, upholding the Rule of Law, and honoring the sanctity of a jury verdict permeate criminal proceedings not only in federal court, but in state court as well. *Government's Motion to Dismiss, United States v. Trump*, No. 23-cr-257, ECF No. 281; People's Response at pg. 6; Defendant's Motion at pg. 49. Therefore, this Court applies that same balancing of competing public interests to the instant state proceeding in its analysis of Defendant's Motion.

### PART V: PRESIDENT-ELECT IMMUNITY FROM CRIMINAL PROSECUTION

Applying the guidance of the aforementioned sources, this Court finds that Presidential immunity from criminal process for a sitting president does not extend to a President-elect. To begin, the Constitution dictates that only a President, after taking the oath of office, has the authority of the Chief Executive, a President-elect does not. Accordingly, a President-elect is not permitted to

---

[3] Though *Vance* directly involved the matter before this Court, the Supreme Court's Decision came long before trial commenced. The issue in *Vance* dealt squarely with "a subpoena issued to the President by a local grand jury operating under the supervision of a state court." *Vance* at 799. As such, although the doctrine of Presidential immunity is discussed within the dicta of that decision, there is nothing directly on point for the issue currently before this Court.

avail himself of the protections afforded to the individual occupying that Office.[4] This finding is consistent with *US v. Williams*, wherein the D.C. Circuit Court of Appeals held that the Presidential Transition Act of 1963, 3 U.S.C. 102, does not "confer 'official' status on a President-elect." 7 F Supp 2d 40, 51 [DC Circ. 1998]. The D.C. Circuit Court further held that the "Act provides money and office space to the President-elect's transition team but does not—and cannot—deem any of the President-elect's actions 'official' before he or she complies with the Oath and Affirmation Clause." *Id.*

Turning to the three concerns identified above, beginning with the second, the case at bar is well past the initiation stage and whatever threat of public stigma from criminal prosecution that might have existed has long passed. Indeed, one of Defendant's most frequent arguments is that this Court should defer to the will of the citizenry who recently re-elected him to the Office of the Executive, notwithstanding an actual guilty verdict in this case. Thus, whatever stigma that might have existed, will most certainly not interfere with Defendant's ability to carry out his duties – both as President-elect and as the sitting President.

The third concern addresses the mental and physical demands of defending against a criminal proceeding. To be clear, neither the United States Supreme Court, nor the Office of Legal Counsel in either their 1973 or 2000 Memoranda, were concerned solely with the time demands of mounting a defense upon a sitting President. *See Clinton*, 520 US at 703 ("The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution."); *Vance*, 591 US at 801 (Rejection of Defendant's contention that "diversion occasioned by a state criminal subpoena imposes an equally intolerable burden on a President's ability to perform his Article II functions."); 1973 OLC Memorandum at 29 ("[C]riminal proceedings against a President in office should not go beyond a point where they could result in so serious a physical interference with the President's performance of his official duties that it would amount to an incapacitation;" 2000 OLC Memorandum at 24 (Referencing the distinction between the demands on a sitting President's time for a civil trial, versus a criminal trial, which may be mitigated by "skillful trial management."). In fact, a sitting President is subject to impeachment proceedings, civil litigation, and service of criminal

---

[4] Undoubtedly, the transition period between election and the taking of the Presidential oath is one filled with enormous responsibility. Yet, even Defendant in his motion refers to Presidential immunity as one relating specifically to a *sitting* President no fewer than 33 times.

6

process – including subpoenas – all of which impose time demands. *See Nixon*, 418 US 683; *Fitzgerald*, 457 US 731; *Clinton*, 520 US 681; *Vance*, 591 US 786.

The greater concern noted by these same sources is whether the burden impedes on a sitting President's ability to perform his constitutional duties. Defendant analogizes that the same concern applies equally to a President-elect, arguing that the demands on his time to appear at any sentencing would be so significant as to impede his ability to prepare for his constitutional duties during the transition period. This Court is not persuaded. Having addressed and resolved all matters brought before this Court and the verdict now more than half a year behind us, all that remains outstanding in this case is the issuance of this Decision and the imposition of sentence. Scheduling sentence is a function that remains exclusively within the purview of the trial judge and can be easily set down for a date and time certain to minimize disruption and inconvenience, provided that applicable statutory obligations are met.[5] Defendant argues that Special Prosecutor Jack Smith's decision to dismiss the Defendant's federal indictments is evidence of a mandate that all criminal cases pending against the President-elect must cease immediately. The vastly different procedural posture of the instant case renders any comparison to the Special Counsel's indictments unpersuasive.

Further, while Defendant now claims this Court cannot and must not sentence Defendant, the record is clear that Defendant not only consented to, but in fact requested the very adjournment that led us down the path we are on. As the parties are aware, it was on Defendant's application, without opposition from the People, that sentence was adjourned until *after* the Presidential election. Any claim Defendant may have that circumstances have changed as a result of Defendant's victory in the Presidential election, while convenient, is disingenuous. Defendant has always pronounced, since the inception of this case, confidence and indeed the expectation, that he would prevail in the 2024 Election - confidence that has proven well-founded. That he would become the "President-elect" and be required to assume all the responsibilities that come with the transition were entirely anticipated. Thus, it was fair for this Court to trust that his request to adjourn sentencing until after the election carried with it the implied consent that he would face sentence during the window between the election and the taking of the oath of office. The Supreme Court's decision in *Trump* has delayed sentence - not precluded it.[6]

---

[5] CPL Article 380 sets forth, among other requirements, that sentencing must be pronounced without unreasonable delay and afford time for the preparation of a pre-sentence report – which was completed months ago.

[6] The first concern relating to incarceration is addressed in Part IX below.

## PART VI: MOTION TO DISMISS INDICTMENT PURSUANT TO CPL § 210.20(1)(H)

Defendant presents this Court with the novel theory of President-elect immunity as it applies to CPL § 210.20(1)(h), arguing that such immunity presents a "legal impediment to conviction." For the reasons stated above, this Court remains unpersuaded that President-elect immunity is the law and thus, neither that doctrine, nor the Supremacy Clause or Presidential Transition Act present a legal impediment to imposition of sentence. Alternatively, Defendant seeks, in essence, a form of retroactive immunity. Both of these theories are briefly addressed below.

Essentially, what Defendant asks this Court to do is to create, or at least recognize, two types of Presidential immunity, then select one as grounds to dismiss the instant matter. First, Defendant seeks application of "President-elect immunity," which presumably implicates all actions of a President-elect before taking the oath of office. Thus, he argues that since no sitting President can be the subject of any stage of a criminal proceeding, so too should a President-elect be afforded the same protections. Defendant's Motion at pg. 35. Second, as the People characterize in their Response, Defendant seeks an action by the Court akin to a "retroactive" form of Presidential immunity, thus giving a defendant the ability to nullify verdicts lawfully rendered prior to a defendant being elected President by virtue of being elected President. It would be an abuse of discretion for this Court to create, or recognize, either of these two new forms of Presidential immunity in the absence of legal authority. The Defendant has presented no valid argument to convince this Court otherwise. Binding precedent does not provide that an individual, upon becoming President, can retroactively dismiss or vacate prior criminal acts nor does it grant blanket Presidential-elect immunity. This Court is therefore forbidden from recognizing either form of immunity.

## PART VII: THE CLAYTON MOTION

In addition to his claim that Presidential immunity and the Supremacy Clause demand dismissal as a matter of law, he separately argues that President-elect immunity and the Supremacy Clause are factors this Court must consider in connection with his motion to dismiss pursuant to CPL § 210.40(1) in furtherance of justice under this Court's discretionary authority.

CPL § 210.40(1), also known as a Clayton Motion, sets forth ten factors a court should consider individually and collectively when exercising its discretion whether to grant a motion to dismiss in the interests of justice. *See People v. Clayton*, 41 AD2d 204 [2d Dept 1973]. Those factors are:

(a) the seriousness and circumstances of the offense;

8

(b) the extent of harm caused by the offense;

(c) the evidence of guilt, whether admissible or inadmissible at trial;

(d) the history, character and condition of the defendant;

(e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;

(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;

(g) the impact of a dismissal upon the confidence of the public in the criminal justice system;

(h) the impact of a dismissal on the safety or welfare of the community;

(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;

(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.

Dismissals in the interests of justice should be issued sparingly and granted in the "'rare' and 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional considerations' (citations omitted)." *People v. Pittman*, 228 AD2d 225, 226 [1st Dept 1996]. Such motions should be granted only where there is "some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment ... would constitute or result in injustice." *People v. Rahmen*, 302 AD2d 408, 409 [2d Dept 2003]. When considering such motion, a court must refrain from usurping the role of the jury. *Id.; People v. Hudson*, 217 AD2d 53 [2d Dept 1995].

A motion filed pursuant to CPL § 210.40(1) must normally be made within forty-five days of arraignment. CPL § 255.10(1). Notwithstanding that limitation, Defendant requested leave to file this motion following the 2024 Presidential election. As Defendant's status as President-elect presented a factor for consideration that did not exist within 45 days of his arraignment, this Court granted that request. Defendant presents additional factors which he claims, when applied to the ten enumerated categories individually, or collectively, support the "necessary outcome." Defendant's Motion at pg. 54. To be clear, Defendant's claims, other than those related to Presidential immunity from criminal process relate either to evidentiary issues or prosecutorial conduct which occurred prior to indictment, before trial or during trial, and should have been addressed in a properly and timely filed Clayton motion. Nonetheless, this Court will address the claims on their merits as Defendant argues that Presidential immunity and the Presidential Transition Act individually, or taken together with the traditional Clayton factors, warrant a dismissal in the interest of justice.

9

## PART VIII: APPLICATION OF THE CLAYTON FACTORS

This Court will now apply Defendant's claims to the Clayton factors.

(a) The seriousness and circumstances of the offense, and
(b) The extent of harm caused by the offense

Defendant argues that the 34 counts of Falsifying Business Records in the First Degree in this case pale in comparison to the seriousness of the majority of street crimes prosecuted in New York County, and that, coupled with the decisions of other agencies to not pursue charges against Defendant, provides context for this Court to consider factors (a) and (b).

That violent crimes are, or are not, prosecuted in this same courthouse does not negate the seriousness and circumstances of the instant case. Seriousness and harm are not measured solely by the level of violence inflicted or the extent of financial harm. Seriousness can be gauged by considering the significance of the act under the unique circumstances of the case, as well as by the harm to society as a whole. *Cf People v. Norman*, 6 Misc 3d 317 [Sup Ct Kings Cty 2004] ("[N]ature of the crimes charged militate against, rather than in favor of, dismissal" rejecting motion under factors (a), (b), (d), (f), (g) and (h) in prosecution against New York State Assemblyman for 76 counts of offering false instrument for filing as the harm was in the "impairment of public trust."). Here, 12 jurors unanimously found Defendant guilty of 34 counts of falsifying business records with the intent to defraud, which included an intent to commit or conceal a conspiracy to promote a presidential election by unlawful means. It was the premediated and continuous deception by the leader of the free world that is the gravamen of this offense. To vacate this verdict on the grounds that the charges are insufficiently serious given the position Defendant once held, and is about to assume again, would constitute a disproportionate result and cause immeasurable damage to the citizenry's confidence in the Rule of Law.

(c) The evidence of guilt

Defendant claims that the evidence at trial was "weak," and argues that DANY relied on perjured testimony and evidence introduced in violation of the Presidential immunity doctrine. As to the latter, this Court recently issued its Decision and Order finding that no official acts evidence was admitted at trial. Thus, that argument is meritless. As to the allegation that Michael Cohen provided unreliable perjured testimony, this Court presided over the entire trial and sat mere feet from all the witnesses who testified. In doing so, this Court had an opportunity to listen to their testimony and to observe their demeanor and therefore to form an opinion as to their credibility, and having done so, it does not agree with Defendant's characterization of Mr. Cohen's testimony.

10

Moreover, a total of 22 witnesses testified at trial, and over 500 exhibits admitted, all of which supported the jury's verdict. This claim does not weigh in Defendant's favor.

(d) The history, character and condition of the defendant

Defendant argues that his "contributions to this City and the Nation are too numerous to count," and concludes his argument under this section by referencing two NY Supreme Court cases which are entirely distinguishable.[7] Defendant's Motion at pg. 59. This Court agrees that Defendant served his country as President and will do so again in a matter of weeks. However, that service is but one of the considerations to weigh under this factor.

Despite Defendant's unrelenting and unsubstantiated attacks against the integrity and legitimacy of this process, individual prosecutors, witnesses and the Rule of Law, this Court has refrained from commenting thereon unless required to do so as when ruling on motions for contempt of court. However, Defendant, by virtue of the instant motion, directly asks this Court to consider his character as a basis to vacate the jury verdict, and this Court must do so in accordance with the requirements of CPL section 210.40(1)(d).

Defendant's disdain for the Third Branch of government, whether state or federal, in New York or elsewhere, is a matter of public record. Indeed, Defendant has gone to great lengths to broadcast on social media and other forums his lack of respect for judges, juries, grand juries and the justice system as a whole. *See* People's Response at Section IV. C. In the case at bar, despite repeated admonitions, this Court was left with no choice but to find the Defendant guilty of 10 counts of Contempt for his repeated violations of this Court's Order Restricting Extrajudicial Statements ("Statements Order"), findings which by definition mean that Defendant willingly ignored the lawful mandates of this Court. An Order which Defendant continues to attack as "unlawful" and "unconstitutional," despite the fact that it has been challenged and upheld by the Appellate Division First Department and the New York Court of Appeals, no less than eight times. Indeed, as Defendant must surely know, the same Order was left undisturbed by the United States Supreme Court on December 9, 2024. *Good Lawgic, LLC, et al, v. Merchan*, 604 US 24A328 [2024]. Yet Defendant continues to undermine its legitimacy, in posts to his millions of followers. Indeed,

---

[7] Defendant's reference to *People v. Clifford* in support of dismissal due to lack of a criminal history is misleading; that case addressed Clayton motions submitted as to four defendants, three of whom had no criminal records, with relief granted only as to one. 82 Misc 3d 1068 [Sup Ct, New York County 2024]. The second case involves facts wholly incomparable to the instant matter. *People v. Wooten*, 62 Misc3d 1207(A) [Sup Ct, Kings County, 2019].

this is not the only instance in which Defendant has been held in contempt or sanctioned by a Court.[8] Defendant's character and history vis-a-vis the Rule of Law and the Third Branch of government must be analyzed under this factor in direct relation to the result he seeks, and in that vein, it does not weigh in his favor.

(e) Any exceptionally serious misconduct of law enforcement personnel

Defendant next alleges several instances of trial misconduct, including: false testimony elicited by DANY from Stormy Daniels and Michael Cohen; alleged misrepresentations by DANY for the unavailability of potential witness Allen Weisselberg; an "unconstitutional crusade" against Defendant; "unlawful investigative leaks"; and alleged misrepresentations by DANY in the Removal proceedings.[9]

Defendant's arguments that the People committed egregious misconduct by eliciting certain testimony from Mr. Cohen and Ms. Daniels is unsupported, and his arguments mischaracterize the record. This Court entertained countless arguments before and during trial regarding the permissible parameters of the testimony of these witnesses and rulings were made in every instance. If those rulings were violated, objections were voiced and when appropriate, questions and/or answers were stricken from the record. Where necessary, curative or limiting instructions were given to the jury. Notably, the jury credited the testimony of Mr. Cohen and Ms. Daniels and returned a verdict consistent with that finding.

Further, this Court does not share Defendant's characterization of the colloquy surrounding the availability of Mr. Weisselberg. The People unsuccessfully argued for the admission of Mr. Weisselberg's severance agreement as proof of his unavailability to the People, while counsel for Defendant argued that he "wouldn't be surprised if there ends up being foundation for a missing witness instruction about the uncalled witnesses being equally unavailable to both sides." Tr. 3241-3242. Equating an unpersuasive argument with misconduct is a leap this Court will not make. Thus, neither of these claims weigh in Defendant's favor.

---

[8] For example, Defendant has been held in contempt by courts within this jurisdiction and sanctioned by others. *People of the State of New York v. The Trump Organization, Inc.*, No. 451G85/2020 [Sup Ct, New York County 2022]; *Trump v. Clinton*, 653 F Supp 3d 1198 [S.D. Fla. 2023] ("Frivolous lawsuits should not be used as a vehicle for fundraising or fodder for rallies or social media. Mr. Trump is using the courts as a stage set for political theater and grievance. This behavior interferes with the ability of the judiciary to perform its constitutional duty).
[9] While several of these claims are clearly designated by Defendant in support of factor 210.40(1)(e), others were raised in earlier portions of Defendant's motion without reference to a specific Clayton factor. Notwithstanding that omission, the Court will consider those claims as most appropriately falling under subsection (e).

As for the alleged misrepresentations by DANY in connection with the Removal proceedings, this Court is not aware of such misrepresentations. Thus far, Defendant's efforts to remove the case to federal jurisdiction have been rejected. What remains is Defendant's appeal of Judge Hellerstein's denial of his motion for leave to move for removal a second time.

With respect to Defendant's claim of an "unconstitutional crusade" against him and "unlawful investigative leaks," both claims have been raised previously and rejected by this Court. *See* Defendant's Omnibus Motion *generally*; Decision and Order on Defendant's Omnibus Motion Dated February 15, 2024; Decision and Order on People's Motions in *Limine* Dated March 18, 2024. The claims are equally unpersuasive now. While significant portions of Defendant's motion reference a book by a former DANY Assistant District Attorney to bolster these claims, this Court is not swayed. That a former prosecutor wrote a book which is critical of the decisions of District Attorney Alvin Bragg, does not render those decisions unethical, unlawful, or evidence of misconduct.

(f)  The purpose and effect of imposing upon the defendant an authorized sentence

Defendant argues that the effect of imposing an authorized sentence violates "the Presidential immunity doctrine, the Supremacy Clause, the Sixth Amendment, the Eighth Amendment and CPL 380.30(1)," and thus, this factor strongly supports dismissal in the interests of justice. Defendant's Motion at pg. 63. In support of that claim, Defendant refers this Court to his earlier argument in his Motion to Dismiss Part I.E in which he contests the legality of deferring proceedings until he completes his Presidential term. This Court rejects Defendant's claim that proceeding with sentencing is precluded as a matter of law. Analysis of this claim pursuant to this Court's *discretionary authority* is consistent with and addressed below under factor (j).

(g)  The impact of a dismissal upon the confidence of the public in the criminal justice system

Defendant argues that a dismissal will "improve public confidence" in the criminal justice system because anything short of a full dismissal will interfere with the Presidency. This Court's perspective is different. To begin, he claims the New York County jury pool was tainted and that he was unable to select an impartial jury.[10] Defendant raised this same issue previously in a motion for a further adjournment based on alleged prejudicial pretrial publicity. That motion was denied on April 12, 2024. Further, this Court presided over the *voir dire,* and nothing raised during the course of the jury selection process, gives this Court pause regarding the jury pool. And while Defendant

---

[10] Referenced within this category are Defendant's arguments regarding DA Bragg's extrajudicial statements during the pendency of this case, publicity arising from the prosecution of Trump Organization Chief Financial Officer Allen Weisselberg, and public statements by witnesses Michael Cohen and Stormy Daniels.

repeatedly refers to that stage in the process when "more than half" of the potential jurors purportedly self-identified as unable to be impartial as proof of an unfair system, this Court construes that very event entirely differently. First, it is standard practice for this Court to ask prospective jurors at the start of every trial, to self-identify if based solely upon what they've heard about the case up to that point they have reason to believe that they cannot be fair and impartial, or if they cannot serve for any other reason. Thus, while not particularly significant, we do not know how many prospective jurors self-excused because they doubted their ability to be fair, and how many self-excused for some other reason, such as travel plans, childcare responsibilities or a scheduled medical procedure. More importantly, a jury panel where half of its members self-identify as not confident in their ability to serve, for whatever reason, is not entirely uncommon, and their departure left us with those members of the panel who believed they could serve. It was these remaining jurors that the parties were given ample opportunity to examine for the existence of bias, partiality, or hostility. Notably, the attorneys did not question the prospective jurors until after the seated jurors had answered an exhaustive questionnaire – which was prepared with the participation of both defense counsel and the prosecution.

What Defendant is asking this Court to do is to assume that the jurors who self-identified were truthful, while those who remained were not. That conclusion is illogical and entirely unsupported. Further, the record is devoid of any instances during *voir dire,* which lasted four days, of defendant asking jurors whether they had been exposed to any extrajudicial statements by DA Bragg, Mr. Cohen or Ms. Daniels. This would appear to contradict Defendant's stated concern. The aforementioned questionnaire, inquired of prospective jurors as to their media and social media exposure, and the parties were permitted to ask follow-up questions. Defendant's conclusory claims that the jurors were tainted by public access to certain content has no support in the record and thus, cannot be considered under this factor to weigh in his favor.

Notwithstanding that Defendant's claims about the jury pool are unsubstantiated, it is important that this Court address the recent letter submissions of both parties dated December 3, 5 and 9, 2024, regarding Defendant's allegations of juror misconduct. As this Court previously stated in its letter of December 16, 2024, claims of such nature go to the very heart of the criminal process. As such, this Court is prepared to consider any claims of juror misconduct, if and when, Defendant properly files a motion that "must contain sworn allegations[.]" *See* CPL section 330.30(2); Court's Letter Order Dated December 16, 2024. Until then, Defendant's claims are merely unsupported allegations – nothing more. Importantly, no such submission has been made.

14

Finally, Defendant alleges, again, that public confidence is fatally impaired by this Court's alleged "disqualifying conflict." Defendant's Motion at pg. 65. And while Defendant "recognize(s), without conceding," the prior rulings of this Court rejecting such a claim, he pursues it once again. What Defendant does not acknowledge is that he has made three applications to the Appellate Division challenging this Court's rejection of Defendant's motions for recusal, which have all been rejected. Further, Defendant is reminded that very early in these proceedings, this Court sought an opinion from the Advisory Committee on Judicial Ethics, regarding the very issues contained in Defendant's subsequent motions for recusal and which he now raises again. The Committee rendered an opinion on May 4, 2023, finding that "the judge's impartiality cannot reasonably be questioned based on the judge's relative's business and/or political activities" and further advising that there was no requirement that this Court recuse from the proceedings. *See* Opinion of the Advisory Committee on Judicial Ethics, Op. 23-54 [May 4, 2023]. Despite the Opinion, of which Defendant has been aware for over one year, and the repeated Decisions of the Appellate Division, Defendant continues to mount the same baseless attacks in each succeeding motion, albeit with increasing ire. The frequency of the claims and escalating rhetoric in each subsequent motion – does not render the claims true or valid. They are not and it is irresponsible and deeply concerning for counsel to insist on advancing these claims.

To be clear, this is not the only example of Defendant pursuing a claim with increasing indignation while simultaneously failing to acknowledge that this Court's rulings on those subjects have been repeatedly upheld. By way of illustration, Defendant's motion papers refer to the "Unconstitutional Continuation of The Gag Order" as an example of this Court's alleged conflicted status. As noted *supra*, as recently as December 9, 2024, the United States Supreme Court denied an application for a stay regarding that Order in *Good Lawgic, LLC, et al v. Merchan*, a denial following repeated rejections of this claim in lower courts. *See* Part VIII (d). It is therefore bewildering to this Court that Defendant continues to file such papers.

(h) the impact of a dismissal on the safety or welfare of the community

Here, Defendant argues that the welfare of the community is at stake as a dismissal "remov[es] obstacles to an orderly transition of Executive power." Despite the alarming nature of the claim, Defendant provides no basis for it. Defendant's Motion at pg. 67. Consideration of this factor is also addressed under factor (j).

15

(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion

This factor provides no relevant consideration which weighs either in favor of, or against Defendant.

(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose

Here, it is appropriate to address Defendant's argument that his status as President-elect, and the enormity of the responsibilities that accompany the transition, together with all of the other factors, weigh heavily in favor of dismissal in the interests of justice. To be clear, none of the concerns raised by the Supreme Court or the OLC, and referenced in Defendant's motion, are relevant to the instant case. However, recognizing the magnitude of the unique scenario before us, the Court has scrutinized the positions of the respective parties. In so doing, this Court recognizes the importance of considering and balancing the seemingly competing factors before it: ensuring that the Executive Branch is free to fully dispense the duties of the President and safeguard the interests of the Nation, unencumbered by pending criminal proceedings; to ensure that the Supreme Court's ruling and the citizenry's expectation be honored that all are equal and no one is above the law; and the importance of protecting the sanctity of a jury verdict. This Court is simply not persuaded that the first factor outweighs the others at this stage of the proceeding, either on its own or in conjunction with the other Clayton factors.

Defendant's position is that nothing short of an outright and complete dismissal of the jury verdict will suffice to properly address his claims. This Court has painstakingly considered the respective arguments of the parties and finds that setting aside the jury verdict is not the best or only way to reconcile the competing interests. To dismiss the indictment and set aside the jury verdict would not serve the concerns set forth by the Supreme Court in its handful of cases addressing Presidential immunity nor would it serve the Rule of Law. On the contrary, such decision would undermine the Rule of Law in immeasurable ways. Just as this Court finds that President-elect immunity is not an actual precept and one which this Court has no authority to create, so too does this Court find that Defendant's status as President-elect does not require the drastic and "rare" application of its authority to grant the Clayton motion in furtherance of justice.

16

## PART IX: SENTENCING

Finding no legal impediment to sentencing and recognizing that Presidential immunity will likely attach once Defendant takes his Oath of Office, it is incumbent upon this Court to set this matter down for the imposition of sentence prior to January 20, 2025. It is this Court's firm belief that only by bringing finality to this matter will all three interests be served. A jury heard evidence for nearly seven weeks and pronounced its verdict; Defendant and the People were given every opportunity to address intervening decisions, to exhaust every possible motion in support of and in opposition to, their respective positions in what is an unprecedented, and likely never to be repeated legal scenario. This Court must sentence Defendant within a reasonable time following verdict; and Defendant must be permitted to avail himself of every available appeal, a path he has made clear he intends to pursue but which only becomes fully available upon sentencing.

This Court has considered and now rejects the People's suggestion that it adopt the "Alabama Rule" which would preserve the jury verdict while terminating the proceedings as such a remedy would deny Defendant the pathway he needs to exhaust his appellate rights.

The Court has also considered the People's alternative proposal of holding sentence in abeyance until such time as Defendant completes his term of Office and finds it less desirable than imposing sentence prior to January 20, 2025. The reasons are obvious. However, if the Court is unable to impose sentence before Defendant takes his oath of office, then this may become the only viable option.

While this Court as a matter of law must not make any determination on sentencing prior to giving the parties and Defendant an opportunity to be heard, it seems proper at this juncture to make known the Court's inclination to not impose any sentence of incarceration, a sentence authorized by the conviction but one the People concede they no longer view as a practicable recommendation. As such, in balancing the aforementioned considerations in conjunction with the underlying concerns of the Presidential immunity doctrine, a sentence of an unconditional discharge appears to be the most viable solution to ensure finality and allow Defendant to pursue his appellate options. Further, to assuage the Defendant's concerns regarding the mental and physical demands during this transition period as well as the considerations set forth in the 2000 OLC Memorandum, this Court will permit Defendant to exercise his right to appear virtually for this proceeding, if he so chooses. *People v. Reyes*, 72 Misc 3d 1133 [Sup Ct New York County 2011].

17

## PART X: CONCLUSION

THEREFORE, this Court finds that neither the vacatur of the jury's verdicts nor dismissal of the indictment are required by the Presidential immunity doctrine, the Presidential Transition Act or the Supremacy Clause; and

THIS COURT FURTHER FINDS that Defendant's arguments, whether independent of one another, or considered together, in support of his motions pursuant to CPL § 210.40(1) factors (a) through (j) are unpersuasive as no compelling factor, consideration or circumstance submitted demonstrate that imposition of sentence would result in an injustice; and

THIS COURT FURTHER FINDS that there is no legal impediment to imposition of sentence under CPL § 210.20(1)(h); and it is

HEREBY ORDERED that Defendant's motion to dismiss the indictment and vacate the jury verdict pursuant to CPL § 210.20(10)(h) and § 210.40(1) is denied; and it is further

ORDERED, that Defendant appear for sentencing following conviction on January 10, 2025, at 9:30 in the morning, at the Courthouse located at 100 Centre Street in New York County; and it is further

ORDERED, that Defendant may choose to appear at his sentencing in person or virtually. Counsel is directed to inform this Court of Defendant's preference no later than January 5, 2025.

The foregoing constitutes the Decision and Order of the Court.

Dated: January 3, 2025
New York, New York

JAN 0 3 2025

Juan M. Merchan
Acting Justice of the Supreme Court
Judge of the Court of Claims

NOEL J. MERCHAN

18